Accordingly, the Court hereby orders that judgment be rendered in favor of defendant.

This memorandum opinion is adopted by the Court as its findings of fact and conclusions of law, and the Clerk of the Court is directed to prepare and enter the appropriate order.

**Dr. Said A. ASSAF**

v.

**UNIVERSITY OF TEXAS SYSTEM et al.**

**Civ. A. No. 75–H–1266,**

United States District Court,
S. D. Texas,
Houston Division.

Sept. 4, 1975.

Micheal D. Cordell, Larry Watts, Houston, Tex., for plaintiff.

Mark Perlmutter, Asst. Atty. Gen., Austin, Tex., for defendants.

## MEMORANDUM OPINION

SINGLETON, District Judge.

Plaintiff contends that he is being deprived of certain basic civil rights guaranteed him by the Constitution in a context that would confer jurisdicton on this court where one seeks to vindicate such rights. Therefore, this action is premised upon jurisdiction in this court under the provisions of 28 U.S.C. § 1343, 42 U.S.C. § 1983, and 28 U.S.C. § 1331. Having considered plaintiff's complaint and defendants' motion to dismiss, this court concludes that jurisdiction is in fact proper under the above-named sections and is sufficient to grant this court power to confer the limited re-

lief sought.[1] Therefore, on motion of plaintiff for a preliminary injunction and declaratory relief, a hearing was held in this cause on August 25, 1975, and was concluded on that same date.

For the limited purposes of the hearing convened by this court, the facts as this court finds them are quite simple. Dr. Assaf, plaintiff, is a nontenured faculty member in his second year at The University of Texas Health Science Center at Houston, Texas. Dr. Assaf was reappointed to his position with The University of Texas System pursuant to a contract dated August 9, 1974. Under this contract, his employment would end on August 31, 1975. The contract of employment specifically stipulated that Dr. Assaf's appointment was subject to the provisions of the *Rules and Regulations* of the Board of Regents of The University of Texas System.

The *Rules and Regulations* of the Board of Regents of The University of Texas, specifically in Sections 6.8 and 6.(10), set out procedures by which notice of reappointment or nonreappointment of nontenured faculty members shall be given (see Appendix). The written notice required by Section 6.8, in the event of a decision not to reappoint a nontenured faculty member, is specifically referred to in Sections 6.23, 6.35, 6.(10), and 6.(11) of the *Rules and Regulations*.

In relevant part, Section 6.23 reads as follows:

. . . In the event that the employment of a nontenured faculty member is to be terminated prior to the end of the maximum probationary period [seven years], notice shall be given in accordance with Section 6.8 below.

In relevant part, Section 6.35 reads as follows:

Nontenured faculty members who are notified in accordance with Section 6.8 that they will not be reappointed or who are notified in accordance with Section 6.23, 6.8, or 6.9 that the subsequent academic year will be the terminal year of appointment . . .

Section 6.(11) reads as follows:

Each faculty member shall keep the chief administrative officer of the component institution or his delegate notified of his current mailing address. The written notice required by Sections 6.23, 6.8, or 6.9 shall be sent by certified mail, return receipt requested, to the last address given by the faculty member.

Further, Sections 6.23, 6.35, 6.8, and 6.(11) in no way direct one to Section 6.(10) nor in any way imply or expressly state that such sections are subject to or controlled by Section 6.(10).

Dr. Assaf first received written notice on March 22, 1975, that his appointment would be terminated no later than September 1, 1975. This notice of termination was given to Dr. Assaf by Dr. Joel L. Moake, Director of the Division of Hematology, who was Dr. Assaf's superior. Dr. Assaf contests the validity of his termination.

■ With regard to conclusions of law, at the threshold this court must address the question of whether the issues presented before it are matters that require determination by a three-judge court. The court concludes that they are not, relying upon the case of *Board of Regents of The University of Texas System v. New Left Education Project*, 401 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972). In the above-cited case, the Supreme Court came to the conclusion

---

1. In finding jurisdiction, this court rejects any construction that would permit plaintiff to seek relief under 42 U.S.C. § 1983 against parties not construed to be "persons" under that statute, nor to obtain any relief prohibited by the eleventh amendment. *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973) and *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This court does not pass at this time on the jurisdictional questions raised by any other claims which plaintiff has asserted.

that the very Regents' *Rules and Regulations* in issue here were not rules of statewide application. Therefore, such characterization as rules of merely local application precludes the necessity for a three-judge court to review an attack on their constitutionality.

The second question which this court faces is the scope of the relevant inquiry. The court feels constrained to confine itself to the boundaries set out in *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970), with due regard to the guidelines set out in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The mandate of Ferguson set out on page 858 of that opinion is as follows:

> School constituted review bodies are the proper forums for thrashing out such matters. Federal Court hearings in cases of this type should be limited in the first instance to the question of whether or not federal rights have been violated in the procedures followed by the academic agency in processing the plaintiff's grievance. If a procedural deficit appears, the matter should, at that point, be remanded to the institution for its compliance with minimum federal or supplementary academically created standards. This should be done so that the matter can first be made ripe for court adjudication by the school authorities themselves.

The *Ferguson* court clearly articulates its concern for federal judicial efficiency as well as due regard for the relevant competing interests by requiring that a federal district court's inquiry be limited to a determination that the institutional procedures by which a person is terminated comply with due process. *Ferguson, supra* at 859.

■ However, in order to reach the inquiry set out in *Ferguson*, a preliminary question must be viewed. That question is whether the due process clause of the fourteenth amendment requires that in this instance there be a hearing at all. This court must take as a basic premise that without more, an untenured faculty member has no inherent right to a hearing just because his employment is terminated. In order for the protection afforded by the due process clause of the fourteenth amendment to be triggered, there must be a deprivation of some interest that is sought to be protected. That is, there must be some property right or liberty right endangered for procedural due process to elevate the right to a hearing to a level of paramount importance. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Therefore, plaintiff must establish that he has some cognizable property or liberty interest which would require a hearing.

■ In this case, the employment contract of Dr. Assaf stipulates that the contract is subject to the *Rules and Regulations* promulgated by the Board of Regents of The University of Texas System. This court finds that both parties are bound by that agreement and therefore are bound by the terms of the *Rules and Regulations*.

Section 6.8 of the *Rules* expressly provides that an untenured faculty member in Dr. Assaf's situation, *i. e.* in his second year, will receive written notice of a decision not to reappoint him not later than December 15, in this case of 1974. After a careful reading of the entire Section 6, this court can only conclude that this required notice was an unequivocal right. As a matter of law, therefore, the notice of termination given on March 22, 1975, was in direct violation of the Regents' *Rules and Regulations* which in large part are determinative of the rights and expectations of the parties to the employment contract herein.

As stated above, this court has found that Sections 6.23, 6.35, 6.(10), and 6.(11) of the *Rules and Regulations* all refer to Section 6.8. Section 6.23 de-

clares in mandatory terms that "notice shall be given in accordance with 6.8" to a nontenured faculty member in the context presented in this case. Section 6.35 also refers to notification by Section 6.8. Section 6.(11) speaks in terms of "[t]he written notice required by Section 6.23, 6.8 . . . . " The clear import of all of these sections is to place a self-imposed affirmative duty of notification on the university administration. As the court states above, Sections 6.23, 6.35, 6.8, and 6.(11) in no way direct one to Section 6.(10) nor in any way imply or expressly state that such sections are subject to or controlled by Section 6.(10).

■ Section 6.(10) on the other hand appears to attempt to negate the clear intention of the *Rules and Regulations*, which is that notice of nonreappointment be given a nontenured faculty member. But statutory construction requires that statutes or rules be viewed in their entirety. This method of analysis arises from the general presumption that the whole of a statute is intended to be effective. Thus, this court feels compelled to try to reconcile Section 6.(10) with the spirit of giving notice which the rest of Section 6 clearly reflects.

Section 6.(10) must therefore be viewed as a purely remedial section. That is, it contemplates that the University need not reappoint a faculty member to his former position. The administration may rather leave a person with an otherwise valid contract to his contractual remedies only. This view is consistent with the flexibility which an educational institution must have in its hiring and firing practices. However, it tacitly acquiesces in the reality that other conduct of the University may have given rise to a justified and legally pro-tected contract expectation in a faculty member.

■ If not a remedial section, then Section 6.(10) is really purely a trap for the unwary. It would seek to shift a burden already affirmatively undertaken. In this posture, the question squarely presented is whether in the present context a state institution can by some legerdemain divest an individual of a procedural right which that institution has ostensibly already vested upon him. This court concludes that the conduct of The University of Texas insofar as it takes with one hand that which it has just bestowed with the other hand is not the kind of fair play and substantial justice required by due process under the fourteenth amendment.[2] Therefore, insofar as Section 6.(10) would nullify the notice requirements of Section 6.8 and to the extent that it thereby shifts the burden of inquiry to the academic employee, Section 6.(10) is declared unconstitutional. Specifically, the unconstitutional portion of Section 6.-(10) of the *Rules and Regulations* of the Board of Regents of The University of Texas would be as follows:

> . . . Notwithstanding any provision of Sections 6.23, 6.8, or 6.9 to the contrary, no person shall be deemed to have been reappointed or to have been awarded tenure or a seven-year appointment because notice is not given or received by the time prescribed in Sections 6.23, 6.8, or 6.9 or in the manner prescribed in Section 6.(11). Should it occur that no notice is received by the time prescribed in Sections 6.23, 6.8 or 6.9, it is the duty of the academic employee concerned to make inquiry to determine the decision of the chief administrative officer of a component institution, who

---

2. This court has chosen to inquire into the question of due process at two distinctly different levels. The inquiry into the constitutionality of Section 6.(10) is of course only one alternative method of establishing that timely written notice is an integral part of Section 6 of the *Rules and Regulations*. At another level of inquiry, due process in the form of a hearing is of course only required if there has been a deprivation of a liberty right or more pertinently here, a property right.

shall without delay give the required notice to the academic employee.

■ This court at the outset has concluded that *Board of Regents v. Roth,* *supra,* and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), compel that some property or liberty right be found in order for plaintiff to be afforded the protection of the fourteenth amendment. In this case, even absent a constitutional infirmity in Section 6.(10), the court's statutory construction analysis would predicate a conclusion that plaintiff must be afforded a hearing.

In simple summary the court reasons as follows:

1. The relevant *Rules and Regulations* provide that a nontenured faculty member will be notified by December 15, if he is not to be reappointed.

2. The University of Texas System through Dr. Assaf's superiors failed to comply with their own rule of notification.

3. The failure of notification gave rise to a justified expectation interest in Dr. Assaf that he would be rehired. Dr. Aasaf's right to a contract for at least one more year is in the nature of a property right.

4. The property right which Dr. Assaf has is sufficient to require that he be given a hearing in compliance with due process as articulated in *Roth* and *Sindermann.*

The nature of the property right vested in Dr. Assaf requires expansion. The admonition in *Perry v. Sindermann, supra* at 603, 92 S.Ct. 2694, is that a mere "subjective expectancy" is not sufficient for procedural due process protection. When this court speaks of an expectancy of reemployment, it speaks in much the same terms as the court in *Ferguson v. Thomas, supra.* When that court spoke of "expectancy" it is clear that it was speaking in terms of a legal right analogous to the property right of which *Roth* and *Sindermann* spoke.[3] The *Ferguson* court's reasoning is clarified by its citation of *Greene v. Howard University,* 134 U.S.App.D.C. 81, 412 F.2d 1128 (1969), for the following proposition:

> But a college can create an obligation as between itself and an instructor where none might otherwise exist under the legal standards for the interpretation of contract relationships regularly applied to transactions in the marketplace if it adopts regulations or standards of practice governing nontenured employees which create an expectation of reemployment.

430 F.2d 852, 856 (1970). Further, in the present case, the fact that a legal property right in a future contract exists is even more apparent since the contractual rights of the parties are specifically made subject to The University of Texas System's *Rules and Regulations.*

As to the relief to be granted by this court, due process requires that plaintiff be given an expeditious hearing.

■ Further, this court feels compelled to issue an order temporarily staying the termination of Dr. Assaf, pending the outcome of a hearing as ordered

---

3. *But see Duke v. North Texas State University,* 469 F.2d 829 (5th Cir. 1973). Judge Godbold, in his dissent (in footnote 5 at 844), obliquely asserts that *Ferguson,* 430 F.2d 852 (5th Cir. 1970), has in fact been modified by the *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), "property interest" test. The majority in *Duke* takes note of the dissent's point without expressly agreeing and therefore leaves open the exact degree to which *Ferguson* has been modified. To the extent that *Ferguson* would require somewhat less than a property interest to trigger due process protection, *i. e.* a mere "subjective expectation," this court must of course be controlled by *Roth* and *Sindermann.* However, as articulated in the text, this court feels that *Ferguson* and *Sindermann* are in fact consistent. And in any event, the guidelines as to the scope of this court's inquiry must still be as prescribed by *Ferguson, supra* at 858 and 859.

by this court. This court in deciding to grant what in substance amounts to a preliminary injunction is guided by the test set forth in *Blackshear Residents Organizations v. Romney*, 472 F.2d 1197 (5th Cir. 1973).

First, from this court's exposition on the justified expectations of plaintiff with regard to future employment and from the perforce limited testimony on the record, this court must conclude that plaintiff is likely to prevail on the merits.

A second question, whether plaintiff is in danger of suffering irreparable harm, is a more difficult one. The case of *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), has been put forth by defendants as being conclusive on the issue in their favor. In fact, there are many analogies to be drawn. However, this court would distinguish the context of *Sampson* from the present one. In *Sampson*, it was the action of a federal agency which was ultimately to be enjoined. Here, the relevant actions to be stayed are in essence acts by state officers. It can be argued that where federal and state relationships are implicated, the spirit of accommodation would strongly suggest an injunction to be inappropriate. However, this court believes that even in the face of federalist implications, this is the "genuinely extraordinary situation" which the Sampson court believes appropriate for the exercise of a federal court's equity powers. *Supra,* footnote 5 at 188, 94 S.Ct. 937. Here, there is much more than a temporary loss of income which the *Sampson* court admonishes to be insufficient to alone constitute irreparable injury. *Supra* at 186–187, 94 S.Ct. 937. Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician, especially one in the sciences. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money. Also, here plaintiff faces termination less than a week from the date of this court's hearing. It is clear that this situation has come about purely from the inability of plaintiff to clearly ascertain his status until a short time ago. If any fault is to be found, it is in the bureaucratic monolith which operates in most state institutions. Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable. Therefore, at least until there has been a fair determination, in a proper hearing, of the validity of plaintiff's termination, this court is persuaded that fundamental fairness requires that plaintiff's employment not be terminated.

With regard to the third question posed by the *Blackshear* test, and considering the relative positions of plaintiff and defendants, this court feels that whatever burden is placed upon defendants in their exercise of administrative control is minimal and greatly outweighed by the harm to plaintiff which this court seeks to prevent. Also, this court would not challenge the right of a proper University hearing body to ultimately and fairly determine that termination was in fact proper in this case.

As a final point, *Blackshear* would require this court to inquire into whether the issuance of a preliminary injunction in this instance would serve the public interest. This court would respond in the affirmative. Of course, there is a highly important public interest in education and the educational process. The public has a right to expect that faculty members who will directly or indirectly affect the education of their children shall be of impeccable character and have the highest credentials. An accompanying interest of at least equal importance is an interest that there be a fair determination that the educational system is not being deprived of the ex-

pertise of people of superior caliber for merely frivolous reasons not relevant to academic excellence. Until such a determination of the validity of termination has been made, then a presumption of competence and integrity which is an integral part of public confidence in public education mandates that a professor be retained. In a broader sense, this court is saying that the public interest in the present context is best served by not terminating an individual until the due process prescribed has been complied with.

■ A final issue that must be addressed is whether the peripheral financial consequences precipitated by a stay of termination of employment in this case ought to deter this court from staying termination. The problem is that a stay of termination of employment must of necessity require that the professor be paid out of state funds for a period beyond his asserted valid time of employment. This court must reject any analysis which would place the eleventh amendment as a bar to the court's actions. In general, this court feels that the stay issued by this court falls well within the parameters set out in *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908). Further, this court relies on *Edelman v. Jordan*, 415 U.S. 651, 673–674, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and the Supreme Court's articulation therein of the distinctions between the granting of prospective or retroactive relief. Prospective injunctive relief is generally permissible. Here, this court ordered that a termination which had clearly not yet occurred be held in abeyance. Further, whatever the monetary implications of the court's order might be, they are purely incidental to the primary purposes of the relief granted. *Edelman v. Jordan*, 415 U.S. 651, 675, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Therefore, this court concludes that it has afforded plaintiff only that relief which justice and the circumstances require.

## APPENDIX

6.8 In the event of decision not to reappoint a nontenured faculty member, written notice will be given him or her not later than March 1st of the first academic year of probationary service if the appointment expires at the end of that academic year, or not later than December 15th of the second academic year of probationary service if the appointment expires at the end of that academic year. After two or more academic years written notice shall be given not later than August 31st that the subsequent year will be the terminal academic year of appointment. The notice required by this Section is not applicable where termination of employment is for good cause under Section 6.3 above.

6.(10) Reappointment of nontenured members of the faculty to a succeeding academic year, reappointment of members of the faculty who are serving a seven-year term appointment to a succeeding seven-year term appointment, or the award of tenure or a seven-year term appointment, may be accomplished only by notice by the chief administrative officer of a component institution or his delegate with the approval of the Board of Regents. Notwithstanding any provision of Sections 6.23, 6.8, or 6.9 to the contrary, no person shall be deemed to have been reappointed or to have been awarded tenure or a seven-year appointment because notice is not given or received by the time prescribed in Sections 6.23, 6.8, or 6.9 or in the manner prescribed in Section 6.(11). Should it occur that no notice is received by the time prescribed in Sections 6.23, 6.8 or 6.9, it is the duty of the academic employee concerned to make inquiry to determine the decision of the chief administrative officer of a component institution, who shall without delay give the required notice to the academic employee.