**Jeffrey M. BLUM, Plaintiff,**

v.

**John H. SCHLEGEL, et al., Defendants.**

**No. 91–CV–633S.**

United States District Court,
W.D. New York.

July 1, 1993.

James Ostrowski, Buffalo, NY, for plaintiff and Jeffrey M. Blum, plaintiff pro se.

Robert Abrams, New York State Atty. Gen., for defendants (Douglas S. Cream, Buffalo, NY, of counsel).

JEFFREY M. BLUM v. JOHN H. SCHLEGEL, et al.
Docket No. 91–CV–633S

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 716
FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 716
DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 721
A. First Amendment Claim—Objections and Contentions . . . . . . . . . . . . . . . . . . . . 721
B. Preliminary Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 722
   1) Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 723
      a) First Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 723
      b) Eleventh Amendment Immunity/Qualified Immunity Argument . . . . . . . . . 724
      c) Destruction of Professorial Career Argument . . . . . . . . . . . . . . . . . . . . . . . . 726
   2) Likelihood of Success on the Merits—First Amendment Claim . . . . . . . . . . . . 728
      a) Protected Speech . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 728
      b) Adverse Employment Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 730
      c) Motivating Factor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 732
   3) Likelihood of Success on the Merits—Due Process Claim . . . . . . . . . . . . . . . . . 733
      a) "Untimeliness" Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 733
      b) "Arbitrariness" Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 735
   4) Sufficiently Serious Question/Balance of Hardships . . . . . . . . . . . . . . . . . . . . . 736
CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 737
ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 737

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Pursuant to 28 U.S.C. § 636(b)(1)(B) this Court referred all dispositive motions in the above captioned case to the Hon. Carol E. Heckman, United States Magistrate Judge for the Western District of New York for report and recommendation. On December 14, 1992, Magistrate Judge Heckman filed her Report and Recommendation to plaintiff's motion for preliminary injunction.

On December 28, 1992, plaintiff filed "Objections to Magistrate [Judge] Heckman's Report and Recommendation on Plaintiff's Motion for Preliminary Injunction" ("pl. obj."). Defendants filed a "Memorandum in Response to Plaintiff's Objections to Magistrate Judge's Report and Recommendation on Plaintiff's Motion for Reinstatement" ("def. memo.") on January 4, 1993. Plaintiff filed a "Reply to Defendants' Response to Plaintiff's Objections to Magistrate [Judge] Heckman's Report and Recommendation [sic] on Plaintiff's Motion for Preliminary Injunction" ("pl. reply") on January 19, 1993.

Oral argument on plaintiff's objections was heard by this Court on February 19, 1993.

28 U.S.C. § 636(b)(1)(B) provides that a district judge may designate a magistrate judge to submit proposed findings of fact and recommendations for the disposition of dispositive motions. 28 U.S.C. § 636(b)(1)(C) permits the parties to file and serve written objections to such proposed findings and recommendations. Upon the filing of timely objections by a party, the district court's review of a report and recommendation must be de novo, but only as to those portions of the report and recommendation to which a party objects. 28 U.S.C. § 636(b)(1)(C). See also Collins v. Foreman, 729 F.2d 108, 112 (2d Cir.), cert. denied, 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984). The district court is not required to conduct a de novo hearing on the matter, but must arrive at its own independent conclusion about those portions of the magistrate judge's report and recommendation to which objection is made. E. River Sav. Bank v. Secretary of Hous. and Urban Dev., 702 F.Supp. 448 (S.D.N.Y. 1988). Following a de novo review, this Court accepts Magistrate Judge Heckman's Report and Recommendation as articulated herein.

### FACTS

Plaintiff states that "Magistrate [Judge] Heckman's Report selectively summarizes materials from a large factual record ... [with] the effect of portraying plaintiff in a negative light." (pl. obj. at 42). Plaintiff makes a general objection to the "summary." [1] (pl. obj. at 43). Plaintiff also makes numerous references to Magistrate Judge Heckman's "omissions" of evidence and detail from the Report and Recommendation but fails to apprise this Court of objections with any particularity that would allow this Court to determine exactly what plaintiff believes to be "omissions." At several points plaintiff does not dispute the facts as articulated by Magistrate Judge Heckman, but requests that this Court expand on such facts to include his subjective impressions of what he says he thought was occurring at the time. [2]

---

1. Plaintiff articulates only three specific objections to "omissions" in the record. The first is the omission of his co-counsel from the record and the second is to the statement that he "purportedly" contacted certain defendants directly. These objections to the factual statements contained in the Report and Recommendation are wholly irrelevant to the outcome of plaintiff's motion for preliminary injunction. The third objection is to affidavits submitted by two outside law professors. These affidavits are discussed in the section entitled "Destruction of Career Argument," infra.

2. For example, in objecting to Magistrate Judge Heckman's acknowledgment that plaintiff articulated in one of his letters that " 'legal disadvantages ... could accrue to [plaintiff] down the

Local Rule 30(a)(3) states in pertinent part:

> The written objections [to a magistrate judge's report and recommendation] shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objections and shall be supported by legal authority.

The foregoing is intended as an illustration of the type of "objections" plaintiff makes to factual findings and is by no means exhaustive. It appears that plaintiff does not specifically object to the Magistrate Judge's findings of fact but rather objects only to the application of the facts to the law. In light of the foregoing and following a *de novo* review of the record, as reflected in this Court's detailed account below, this Court finds Magistrate Judge Heckman's articulation of the facts to be sufficiently accurate and complete. Thus, this Court adopts the facts as set forth in the Report and Recommendation.

In September of 1985, plaintiff joined the faculty of the State University of New York at Buffalo Law School ("Law School") as an associate professor, which was considered a tenure track position. (Appendix to Complaint ("A") at A–9). Although the record is sketchy as to what transpired from the time plaintiff arrived at the Law School until the culmination of events that prompted this suit, it appears that plaintiff published two articles in the "Generation," a SUNY Buffalo student magazine. Both articles, one published in January 1988 and the other in September 1989, expressed the view that possession or consumption of marijuana should not result in the punishments currently inflicted for such crimes. (Plaintiff's Supplementary Affidavit in Opposition to Defendants' Motion to Dismiss the Amended Complaint and in Support of Plaintiff's Motion for Preliminary Injunction ("pl. supp. aff.") at Ex. K). Plaintiff also participated in a debate relating to the propriety of civil disobedience. (Id.).

Beginning in July of 1988, plaintiff's colleagues began to express doubts concerning plaintiff's suitability for promotion and tenure. (A–52—A–61). In response to the doubts expressed, on September 13, 1989, David Filvaroff, then Dean of the Law School, informed plaintiff that his promotion and tenure consideration could be deferred one year. If plaintiff chose not to accept the deferral option, the academic year 1990–1991 would be the year plaintiff would be considered for promotion and tenure. (Supplementary Affidavit in Opposition to Plaintiff's Motion for Reinstatement ("def. supp. aff.") Ex. A). If he were denied tenure, he would be informed that the academic year 1991–1992 would be his last.[3] (Id.).

Apparently, plaintiff's prospects for tenure were not discussed again until Dean Filvaroff called an informal meeting of plaintiff's "committee" on October 1, 1990. (A–11). During this meeting, plaintiff was advised that if he applied for tenure in the near future, it likely would be denied because of "very weak scholarship." (A–11–A–16). Extensive correspondence between plaintiff and certain members of the Law School faculty followed. (See A–11–A–30, A–32–A–51, A–72–A–95, A–100–A–115; def. supp. aff. exs. B—Y).

Initially, plaintiff's letters expressed "surprise" at the outcome of the October meeting, notwithstanding the fact that as early as July of 1988 plaintiff was informed that the likelihood of his receiving tenure was not as promising as he may have hoped. (A–11–A–16). In a letter to Dean Filvaroff dated

---

road' if he exercised the right given him by Mr. Cream to cancel the *ad hoc* evaluation," plaintiff states that he "never imagined that he was under some obligation to participate in an *ad hoc* seventh-year review." Thus it is clear from this example that plaintiff is urging this Court to accept subjective impressions as fact. For obvious reasons, this Court will not do so.

3. Plaintiff's contract was to expire in August of 1991. However, if he were denied tenure, his contract would be extended to cover the 1991–1992 academic year. (Id.).

October 16, 1990, plaintiff attacked defendants' handling of the October 1, 1990 meeting as highly irregular and requested that his tenure evaluation go forward and be scheduled for March 15, 1991. (Id.).

In response to plaintiff's October 16 letter, Dean Filvaroff explained that the meeting was convened so that plaintiff could be informed of "the probable outcome of [his] tenure" request, should he make such a request, and to give plaintiff the "choice of not pursuing the matter to a formal determination." (A–17). Dean Filvaroff reminded plaintiff that he had previously been informed that "evaluations of [his] teaching and ... colleagueship were not uniformly or strongly affirmative" and such criteria were important to any tenure decision. (Id.). These deficiencies possibly could be overcome by a very strong showing in the area of scholarship. (A–17–A–18). Dean Filvaroff acknowledged plaintiff's request for a formal tenure meeting on March 15[, 1991], but suggested that plaintiff may "wish to consider the possibility of deferring ... tenure consideration until [the] fall [of 1991]." By so deferring, plaintiff could reduce his teaching load by one-half, thereby providing him with "additional time and opportunity to continue work on [his scholarship]." (Id.). Plaintiff responded with yet another letter which stated that he was pleased that Dean Filvaroff favored a "cooperative solution to [the] problems ..." presented and that deferring promotion until the fall of 1991 "may be a step in the right direction." (A–23). Plaintiff acknowledged that his progress in improving his scholarship had not been as rapid as he had planned and explained that he relied "on the option of coming up for promotion [4] [in the fall of 1991] in order to take advantage of the half-load option in the Spring [of 1991] ..." as suggested by Dean Filvaroff. Plaintiff conditioned full acceptance of the option on two things: (1) obtaining information relating to which courses would be eliminated and (2) the "proper appointment papers" for academic year 1991–

1992. Moreover, plaintiff acknowledged that in cases of continued appointment beyond the contract period a confirming letter from the President of the Law School was required to comply fully with the Law School regulations. Plaintiff requested that this confirming letter "extending [his] current contract" to the academic year 1991–1992 be forwarded to him as quickly as possible. (A–24). On November 15, 1990, Dean Filvaroff forwarded a letter to plaintiff stating "I think you have made an appropriate choice in deciding to defer your tenure consideration until next fall. I will, accordingly, proceed with arranging for your appointment for the 1991–92 academic year...." On the same day, plaintiff delivered another letter to Dean Filvaroff with a copy of his prior appointment letter and requested a confirmatory letter "identical" to his prior letter of confirmation with the exception that the dates would be changed. (A–25).[5] Dean Filvaroff responded by assuring plaintiff that "appropriate written confirmation of [plaintiff's] status for next year ..." would be forth coming and that he, Dean Filvaroff, would attempt to relieve plaintiff of his large class but may be able to relieve plaintiff only of his smaller seminar class. (A–28). Dean Filvaroff also stated that he was uncertain how long securing the letter that plaintiff requested would take but that his contract would be extended to cover the 1991–1992 academic year. (A–28). Via letter dated December 21, 1990, Dean Filvaroff stated that

> [he] recommend to the Provost that [plaintiff] be reappointed for an additional one-year term beginning September 1, 1991, and extending to August 31, 1992. This will allow you additional time to continue work on your scholarship and allow presentation of your candidacy for promotion and tenure sometime next fall; it is my understanding that this complies with your wishes.
>
> Since you will have already served for three years as an Associate Professor,

---

**4.** Although plaintiff repeatedly refers to "promotion" in the fall of 1991, this Court notes that the statement made by Dean Filvaroff in his November 1, 1990 letter specifically references "tenure" consideration. (A–19).

**5.** Based on the next correspondence from Dean Filvaroff, it appears as if plaintiff received the Dean's letter and then responded with his own letter.

SUNY rules require that your reappointment be effected with a change of title. Thus, the formal documents will designate your status as that of a Visiting Associate Professor.

As consideration of your tenure candidacy has been postponed, I must, in accordance with the Policies of the Board of trustees, inform you that your employment by the University will terminate on August 31, 1992. This letter constitutes a formal notice of nonrenewal.... It can be modified by explicit withdrawal and concurrent notice of further appointment by the President. I want to reassure you, however, that if the decision on your tenure is favorable next fall, this notice will be withdrawn.

(def. supp. aff. Ex. H).

In a letter dated January 5, 1991, plaintiff expressed gratitude for the "compromise" that had been reached and stated that he believed the separation of the tenure process from the promotion process was a good idea and expressed confidence that the "promotion review [would be] done in a reasonably normal way." (A–38). Further, he acknowledged the need to set up a new promotion and tenure visiting subcommittee [6] for the fall of 1991. (A–39).[7]

Upon receipt of the December 21st letter, plaintiff, via letter to Dean Filvaroff dated January 21, 1991, revealed his belief that his reappointment also would grant him tenure without a formal review. Dean Filvaroff responded to this revelation by unequivocally stating that such an appointment was never offered, explicitly or impliedly. (def. supp. aff. ex. I). Dean Filvaroff also reiterated that he had suggested to the Provost that plaintiff be reappointed for one-year and that it was his understanding that plaintiff's promotion and tenure review would take place in the fall of 1991. The Dean articulated that the only remaining concern was to bring plaintiff's Visiting Committee to full strength. (Id.).

A February 4, 1991 correspondence from plaintiff to Dean Filvaroff accused the Dean of being "confused" about the offer he actually extended to plaintiff,[8] but then goes on to inform the Dean that he had met with Ken Joyce and that he, plaintiff, was pleased with the selection of the new promotion and tenure subcommittee. (def. supp. aff. Ex. K).

In May of 1991, plaintiff sent several letters attacking the general tenure procedures of the Law School. (A–92–A–105).

In August of 1991, plaintiff wrote a letter to the President of the Law School, William Greiner, stating that he believed his promotion and tenure process had been concluded in his case. (A–109). Plaintiff based this conclusion on the *Faculty and Professional Staff Handbook* (1989 edition) which plaintiff interpreted to require a tenure review to be "conducted no later than the sxith [sic] year the candidate holds unqualified rank. In exceptional circumstances, *and upon request of the candidate,* review may be deferred until the seventh year...." (A–109). Plaintiff states in his letter that he did not request nor consent to his tenure review being held in the 1991–1992 academic year and since the 1990–1991 academic year had completed, so must have his promotion and tenure evaluation.

The Law School took a different position on the alleged completion of plaintiff's promotion and tenure evaluation as is reflected in a September 24, 1991 letter from Law School professor Kenneth Joyce informing plaintiff that his subcommittee was " 'ready, willing and able' to go forward with dossier and other preparation for presentation of [plaintiff's] tenure and promotion candidacy to the full Committee," which was scheduled to meet on October 18, 1991. (def. supp. aff. Ex. L). Professor Joyce further explained

---

**6.** A promotion and tenure visiting subcommittee gathers pertinent information relating to a tenure candidate. The subcommittee then presents the information to the full Promotion and Tenure Committee. (A–20).

**7.** In a letter dated February 4, 1991, plaintiff explained that he mailed the January 5, 1991 letter prior to receiving the December 21, 1990 letter from Dean Filvaroff. (def. supp. aff. Ex. J).

**8.** Plaintiff attempted to explain to the Dean that he, the Dean, had breached his promise to give plaintiff a technical tenure appointment. Plaintiff also expressed his opinion that he had a contract claim against the law school.

that he and the subcommittee believed that prior to proceeding, they should obtain plaintiff's approval to proceed as he also had a "right *not* to be evaluated and voted on by the [Promotion and Tenure] Committee." (Id.).

Plaintiff responded by filing suit in federal district court here on October 1, 1991, alleging violations of the Fifth and Fourteenth Amendments, denial of academic freedom in violation of the First and Fourteenth Amendments, violations of due process which subjected plaintiff to grievous loss of liberty interest in professional reputation, harassment and retaliatory termination for exercise of his rights under the First and Fourteenth Amendments. On November 6, 1991, Assistant Attorney General Douglas Cream notified plaintiff that the promotion and tenure process would go forward unless plaintiff unambiguously informed him to the contrary. (Notice of Motion Claim No. 83991 Ex. C). On December 16, 1991, Professor Joyce wrote to plaintiff informing him that because he did not unambiguously state whether or not he wanted the promotion and tenure process to proceed, it was the policy of the University to proceed. Plaintiff did not request that his evaluation not go forward and affirmatively discussed proceeding with the evaluation, but requested that the evaluation be postponed until the completion of certain defendants' depositions scheduled for February and March of 1991. (def. supp. aff. Ex. N, O). In response to plaintiff's request to postpone his evaluation until the completion of the depositions in this case, Lee A. Albert, Associate Dean of the Law School warned plaintiff of the consequences of postponing his evaluation at such a late date and reminded plaintiff that his contract was set to expire in six months unless plaintiff were awarded tenure. (def. supp. aff. Ex. T). Associate Dean Albert further explained that under University policies the deadline for submission for review of candidates was April 15, 1992. Consequently, the Law School denied plaintiff's request for a delay. (Id.).

Following several additional letters reiterating the parties' positions, on April 2, 1992, plaintiff executed a document entitled "Personal Resolution" wherein he

> declare[d]—clearly, unambiguously and without conditions—that [he did] not want a Promotion and Tenure Evaluation . . . to go forward at any time during the remainder of academic year 1991–1992.

(def. supp. aff. Ex. X). Plaintiff cited the "sham" nature of the evaluation as the reason for his decision. (Id.). On April 6, 1992, Dean Filvaroff sent a letter acknowledging plaintiff's request to withdraw from promotion and tenure consideration. (def. supp. aff. Ex. Y). Dean Filvaroff also reminded plaintiff that termination of his evaluation at such a late date "effectively preclude[d] resumption and completion of any such process prior to the effective date of [his] termination." (Id.).

Plaintiff's contract expired on August 31, 1992 and plaintiff was requested to vacate his office. He refused. (Letter to Richard T. Sullivan, dated December 24, 1992 ("Sullivan Letter") Ex. C). Thereafter, school officials removed the contents of plaintiff's office and placed them in storage. (Sullivan Letter Ex. N).

On September 30, 1992, plaintiff entered the unattended waiting area connected to the office of Associate Dean Albert after hours and while Associate Dean Albert was engaged in a telephone conversation with defendants' attorney, Douglas Cream. (Affidavit of Lee A. Albert filed November 13, 1992 ("Albert aff.") ¶ 8). Plaintiff remained in the waiting area, unannounced, until Associate Dean Albert and Mr. Cream finished their conversation concerning Albert's upcoming deposition and his knowledge of the events surrounding this lawsuit. (Id.).

On October 12, 1992, plaintiff telephoned Associate Dean Albert and admitted listening to the conversation. (Id. ¶ 9). Plaintiff requested that an affidavit or some other type of statement containing the details of the conversation be executed by Associate Dean Albert. (Id. ¶ 10; Transcript of Conversation ("Transcript") p. 5). Associate Dean Albert refused.[9] (Id.).

---

9. A review of the Transcript reveals that plaintiff attempted to elicit details of the conversation.

Associate Dean Albert disclosed the substance of

## DISCUSSION

### A. First Amendment Claim—Objections and Contentions

Plaintiff first objects to Magistrate Judge Heckman's "mistaken impression of an ongoing Promotion and Tenure evaluation by erroneously stating that plaintiff distributed [his Personal Resolution] to all members of the Promotion and Tenure Committee." (pl. obj. at 8). Plaintiff argues that during his sixth year of teaching, he never consented to nor did he request that his promotion and tenure evaluation be postponed until the 1991–1992 academic year.[10] (Id.). Plaintiff argues that the Promotion and Tenure Committee never formally evaluated him thus they could not have denied and did not deny him tenure. However, defendants, particularly Dean Filvaroff, did deny plaintiff promotion and tenure, thus Magistrate Judge Heckman's "assertion that 'defendants never denied plaintiff tenure' confuses 'defendants' ... with the law school's 'Promotion and Tenure Committee'...." (Id. at 11). Plaintiff contends that Magistrate Judge Heckman's "depiction of plaintiff as 'delaying and eventually withdrawing from the review process,' cannot have the legal significance she attributes to it because the would-be 'review process' of which she speaks was nothing more than a possible means of facilitating settlement of the action once the litigation had begun." (Id. at 12). Plaintiff argues that there "never was any seventh year Promotion and Tenure evaluation from which plaintiff could have withdrawn because plaintiff's seventh year was his post-terminal year...." (Id. at 13).

Plaintiff further asserts that "[t]o the extent there was [sic] any serious legal issues involved in question of seventh-year promotion and tenure review, it was the one that was before Judge Skretny when he decided that the case was ripe for litigation and that discovery could go forward." Plaintiff argues that by determining that plaintiff con-

sented to review in the seventh-year, Magistrate Judge Heckman is attempting to reverse this Court's determination. (Id. at 17). Plaintiff argues that by following the Report and Recommendation, this Court would be "acting in a highly erratic and arbitrary manner." Plaintiff states that this Court, by allowing discovery to go forward, "caused him to expend limited resources on eight depositions and incur the additional hostility that came from his litigating the case." (Id. at 18).

In addition, plaintiff argues that the seventh year review was essentially a sham and intended only as a litigation maneuver. (Id. at 20). Moreover, plaintiff asserts that he was treated differently than other promotion and tenure candidates because of his outspokenness on a number of controversial issues. (Id. at 5).

Plaintiff contends that the cases relied on by Magistrate Judge Heckman in support of the conclusion that plaintiff waived his right to review in his sixth year by agreeing to a review in the seventh year are factually distinguishable. (Id. (discussing *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988) and *Simmons v. Lyons,* 746 F.2d 265 (5th Cir.1984))). Those cases involved plaintiffs who never submitted applications and their claims were dismissed because the employer had no way of knowing that they wanted to be considered for the job and the distinction with his case lies in the fact that defendants Greiner, Levy and Filvaroff knew that plaintiff wanted Promotion and Tenure. (Id. at 15). "By blurring the distinction between plaintiff's sixth and seventh years and overlooking the university's rules regarding promotion and tenure Magistrate [Judge] Heckman managed to persuade herself that plaintiff had failed to apply for tenure or refused to let himself be considered for promotion and tenure." (Id. at 16).

Plaintiff contends that by mid-January 1991 it had become clear that any "consent

the questions asked by Mr. Cream, but did not reveal his answers.

**10.** Plaintiff disputes Magistrate Judge Heckman's "account of events." In light of this Court's thorough examination of the record and detailed

statement of "events," this Court will not reiterate plaintiff's interpretation and rendition of facts. The record, as earlier discussed herein, demonstrates what transpired during the relevant period of time and there is no need to recite each party's rendition or interpretation.

plaintiff may have given to deferring review was clearly and consistently conditioned on the promise of such review being only for promotion and not for tenure." (Reply at 7). Plaintiff asserts that all of the evidence in the record supports his position that he did not consent to defer promotion and tenure review. (Id.)

Plaintiff argues that Magistrate Judge Heckman did not understand the nature of plaintiff's First Amendment claim. He claims that he was denied promotion and tenure during his sixth year without having the opportunity to bring his case before the Promotion and Tenure Committee because of his speech activity. (Id. at 19). Plaintiff contends that Magistrate Judge Heckman failed to apply the test for violation of First Amendment rights as set forth in *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). He asserts that the record is replete with evidence that he (1) was terminated during his sixth year and (2) that the termination was due to exercise of first amendment rights (Id. at 21 (citing Plaintiff's Affidavit and Supplementary Affidavit in Support of the Motion for Preliminary Injunction)). Further, defendants have failed to provide any evidence that his termination was for any reason other than his exercising of his First Amendment rights. (Id. at 22). Plaintiff acknowledges that defendants assert that his teaching ability and his scholarship were the reasons for his discharge but contends that the record contains "substantial evidence that plaintiff's performance both as effective teacher and productive scholar were far above average for persons receiving tenure on the law faculty" but that Magistrate Judge Heckman ignored this evidence. (Id. (citing plaintiff's Reply Affidavit in Support of the Motion for Preliminary Injunction)).

On the other hand, defendants maintain that Magistrate Judge Heckman correctly determined that plaintiff agreed to postpone promotion and tenure review and subsequently took "himself out of consideration through his 'Personal Resolution.'" (def. memo at 4). Defendants assert that not only is his withdrawal from consideration documented but his deferral of tenure until the fall of his seventh-year is also fully documented. (Id.).

Defendants argue that plaintiff's contention that he participated in a Spring 1992 review as a means of facilitating settlement is illogical in light of his admission that no stipulations were in place regarding his Promotion and Tenure review during the Spring of 1992. (def. memo at 6). Further, that this is an admission by plaintiff that the promotion and tenure review was ongoing in the Spring of 1992. (Id.).

Moreover, defendants contend that plaintiff's reference to the Order(s) of this Court determining that this case was ripe for litigation is mystifying because this Court has not ruled on any substantive issue in this case. (Id. at 8).

Defendants also contend that plaintiff has failed to show a probability of success on the merits. Plaintiff's assertion that defendants must show that he would have been denied tenure regardless of his claimed exercise of free speech is erroneous. Such a determination need not be made because plaintiff was not terminated. Defendants argue that plaintiff has failed to point to any contradictory evidence not of his own fabrication. Moreover, plaintiff was neither terminated nor denied tenure, he withdrew, according to defendants.

Finally, defendants maintain that plaintiff has not alleged that he was threatened with termination unless he altered or stifled his speech. Instead, plaintiff argues that he was terminated in retaliation for his exercise of free speech, like the allegations of the employees in *Gorski* and thus *Elrod* is inapplicable. (Id.).

To the extent practicable, the positions of the parties are subsumed in the ensuing discussion relating to preliminary injunction.

B. *Preliminary Injunction*

To obtain a preliminary injunction plaintiff must demonstrate

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tip-

ping decidedly toward the party requesting the preliminary relief.

*Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co., Inc.*, 916 F.2d 76, 78 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991) (citations omitted). The plaintiff has the burden of persuasion on each preliminary injunction element. *United States v. Jefferson County,* 720 F.2d 1511 (11th Cir.1983). Moreover, the district court must keep in mind that "a preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir. 1990).

In his effort to demonstrate irreparable harm, plaintiff presents arguments based on First Amendment, Eleventh Amendment/qualified immunity, and destruction of career. They will be addressed seriatim below.

### 1) *Irreparable Harm*

#### a) *First Amendment*

Plaintiff argues that " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " (pl. obj. at 2 (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976))). Based on this quote, plaintiff concludes that he is entitled to a preliminary injunction as a matter of law if he can demonstrate a probability of success on the merits of his first amendment claim. (Id.).

■ When a plaintiff alleges that his right to free speech is being directly infringed upon, that is, the violation is ongoing at the time plaintiff files suit, the questions of irreparable harm and likelihood of success on the merits are necessarily subsumed into the whole First Amendment inquiry, *Gannett Satellite Info. Network, Inc. v. Township of Pennsauken,* 709 F.Supp. 530 (D.N.J.1989), because the loss of such First Amendment freedoms for even minimal periods of time constitutes irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Therefore, in cases where the plaintiff is given a choice of relinquishing his First Amendment rights in favor

of retaining his employment, the issuance of a preliminary injunction turns on whether his First Amendment rights were violated by the defendant because the relinquishment of such rights cannot be remedied or compensated.

■ Here, plaintiff does not allege he was forced to choose between relinquishing his First Amendment rights or retaining his employment. Plaintiff alleges he was terminated outright and although he no longer holds a position at the Law School, he remains totally free to express his views on any topic he so chooses and has vigorously done so.

■ As Magistrate Judge Heckman correctly noted, when a plaintiff alleges that his First Amendment rights are being infringed upon indirectly, there must be a showing of irreparable harm. (Report and Recommendation at 33). Although plaintiff attempts to distinguish this case from *Am. Postal Workers Union, AFL–CIO v. United States Postal Serv.,* 766 F.2d 715 (2d Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1262, 106 S.Ct. 1262, 89 L.Ed.2d 572 (1986) and *Savage v. Gorski,* 850 F.2d 64 (2d Cir.1988), it is clear that the plaintiffs in *Am. Postal Workers Union* and *Savage,* as well as plaintiff herein, allege that termination occurred in retaliation for the exercise of the right to free speech. The distinction is important because on the one hand a person has lost his First Amendment right and has retained his employment. On the other hand a person has lost his employment but retained his First Amendment rights. Therefore, in the latter case, the damage is the loss of income, not the loss of First Amendment rights. The Court in *Am. Postal Workers* reiterated the Supreme Court's position that "except in a 'genuinely extraordinary situation,' irreparable harm is not shown in employee discharge cases simply by a showing of financial distress or difficulties in obtaining other employment." *Am. Postal Workers,* 766 F.2d at 721 (quoting *Sampson v. Murray,* 415 U.S. 61, 92 n. 68, 94 S.Ct. 937, 953 n. 68, 39 L.Ed.2d 166 (1974)).

■ The analysis then turns to a question of whether there has been a chilling of free speech because a chilling would consti-

tute irreparable harm. A showing of a chilling effect must amount to "a clearcut infringement of first amendment rights which, absent preliminary injunctive relief, either has occurred or will occur in the future." *Am. Postal Workers*, 766 F.2d at 722. More importantly, there must be a showing that the chilling "of the right to speak ... [will] be thawed by the entry of an interim injunction, since the theoretical chilling of protected speech ... stems not from the interim discharge, but from the threat of permanent discharge, which is not vitiated by an interim injunction." *Id.* at 722. The opinion of the Second Circuit, as expressed in *Am. Postal Workers* was reiterated and strengthened in *Savage*, 850 F.2d 64.

In the case at hand, plaintiff has failed to allege that there was a chilling of the right to speak or that the issuance of an injunction would thaw that chill. Thus, this Court agrees with Magistrate Judge Heckman that plaintiff has failed to meet the burden of establishing irreparable injury as to his First Amendment claim so as to mandate injunctive relief. (Report and Recommendation at 33).

### b) *Eleventh Amendment Immunity/Qualified Immunity Argument*

Plaintiff asserts that courts have repeatedly held that plaintiffs suing state agencies in federal court could show irreparable harm based on defendants' probable immunity from having to pay monetary damages retroactively. (Id. at 35 (citing *Savage v. Commonwealth of Pa.*, 475 F.Supp. 524, 533 (E.D.Pa.1979)); *Faulkner v. North Carolina Dep't of Corrections*, 428 F.Supp. 100 (W.D.N.C.1977); *Jessen v. Village of Lyndon Station*, 519 F.Supp. 1183 (W.D.Wis.1981); *Schrank v. Bliss*, 412 F.Supp. 28 (M.D.Fla. 1976)). Plaintiff maintains that in each of these cases it was held that there was a question as to whether or not the defendants would be able to "invoke their good-faith qualified immunity against having to pay damages personally." (Id.). Plaintiff entitles this his " 'irreparable harm because of Eleventh Amendment immunity' argument."

It appears that plaintiff is blurring Eleventh Amendment immunity with qualified immunity. "The privilege ... [of] qualified immunity [is] ... entirely distinct from the immunity conferred by the Eleventh Amendment." *Gan v. the City of New York*, 996 F.2d 522, 529 (2d Cir.1993).

The Eleventh Amendment, with few exceptions, bars federal courts from entertaining suits brought by a private party against a state in its own name. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 662–63, 39 L.Ed.2d 662, 94 S.Ct. 1347 [1355–56] (1974); *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 79 L.Ed.2d 67, 104 S.Ct. 900 (1984). The availability of immunity under the Eleventh Amendment does not depend on the nature of the function performed by the state.

The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166–67, 87 L.Ed.2d 114, 105 S.Ct. 3099 [3105–06] (1985); *Hafer v. Melo* [—— U.S. ——, ——] 116 L.Ed.2d 301, 112 S.Ct. 358, 362 (1991). As to a claim brought against him in his individual capacity, however, the state official has no Eleventh Amendment immunity. *See, e.g., id.* at [——, 112 S.Ct. at] 365; *Scheuer v. Rhodes*, 416 U.S. 232, 238, 40 L.Ed.2d 90, 94 S.Ct. 1683 (1974) (Eleventh Amendment does not bar award of damages to be paid not from the state treasury but from the official's personal funds).

*Id.* at 529.

In sum, the capacities in which a state official is sued for damages under § 1983 establish parallel lines of privileges. To the extent that such a claim is asserted against the state official in his official capacity, he may assert the state's Eleventh Amendment immunity against suit, but he may not assert a personal official privilege of absolute or qualified immunity. To the extent that such a claim is asserted against him in his individual capacity, he may assert privileges of absolute or qualified im-

munity but may not assert immunity under the Eleventh Amendment.

*Id.* at 529.

▮ Plaintiff's original Complaint named the State of New York and the State University of New York, however, that Complaint was dismissed and the Amended Complaint names neither the State nor the University. However, as stated above, to the extent that plaintiff's claims are against defendants in their professional capacities, they may assert the state's Eleventh Amendment immunity from suit.

▮ Although plaintiff does not cite any Second Circuit cases in support of his argument, the Second Circuit has determined that in cases where the defendant is protected by the Eleventh Amendment which thus renders the plaintiff unable to recover monetary damages, the injury will be irreparable. *United States v. State of New York,* 708 F.2d 92, 93 (2d Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984). Moreover, it is of no moment that the plaintiff may have a cause of action against the defendant in the New York Court of Claims because "in deciding whether a federal plaintiff has an available remedy at law that would make injunctive relief unavailable, federal courts may consider only the available *federal* legal remedies." *Id.* (citing *Petroleum Exploration, Inc. v. Pub. Serv. Comm'r,* 304 U.S. 209, 217 & n. 8, 58 S.Ct. 834, 839 & n. 8, 82 L.Ed. 1294 (1938)); *DiGiovanni v. Camden Fire Ins. Ass'n,* 296 U.S. 64, 69, 56 S.Ct. 1, 3, 80 L.Ed. 47 (1935) (emphasis in original). Thus, plaintiff has raised a question of Eleventh Amendment immunity in his Amended Complaint.

▮ The only remaining related question then is whether plaintiff may be compensated fully, should he prevail, because he has sued defendants in their individual as well as their professional capacities. Defendants sued in their individual capacity may be entitled to invoke the common law doctrine of qualified immunity.

> Qualified immunity is the doctrine that shields government officials performing discretionary functions from being held liable for civil damages arising from their

actions which do "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

*P.C. v. McLaughlin,* 913 F.2d 1033, 1039 (2d Cir.1990) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Applying this definition, it appears that plaintiff is contradicting himself by stating on the one hand that defendants did "not violate clearly established statutory or constitutional rights" thereby allowing them to invoke the doctrine of qualified immunity, and on the other hand claiming that defendants violated his right to due process and freedom of speech, which, of course, are clearly established constitutional rights. Thus, for plaintiff to succeed on his due process or First Amendment claims he must establish that defendants violated his right to due process or free speech, thereby destroying defendants' right to qualified immunity. If defendants are not entitled to invoke the doctrine of qualified immunity, plaintiff will be entitled to recover money damages which would make him whole and thus, no irreparable harm exists.

However, "even when a plaintiff's federal rights are clearly defined, qualified or good faith immunity might still be available if it was 'objectively reasonable for [the public official] to believe that his acts did not violate those rights.'" *Id.* (quoting *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986))). As is discussed fully *infra,* in order for plaintiff to prevail on his First Amendment claim, he must show, among other things, that he was denied promotion and tenure. In order to succeed on his due process claim he would have to demonstrate, among other things, that he was entitled to a review in his sixth year of teaching and improperly was deprived of that right. To succeed on either of these claims plaintiff is required to show that he did not consent to postpone promotion and tenure review, as discussed fully *infra.* Given the facts set forth in the discussion herein, it appears that plaintiff had consented to a seventh year review, this Court cannot say that it was not "objectively reasonable"

**726**

for defendants to believe that they did not violate plaintiff's right to due process. Thus, there is a substantial likelihood that, should plaintiff prevail on his due process claims, defendants would be entitled to qualified immunity and thus plaintiff would be precluded from recovering monetary damages.

Based on the foregoing, this Court does not agree with the finding of the Magistrate Judge and finds that plaintiff has demonstrated irreparable harm.

### c) Destruction of Professorial Career Argument

■ Plaintiff asserts that this argument is on the "cutting edge legally." (Id. at 37). Plaintiff argues that his termination from his job is different from the average termination from a job

> (1) because employment as a professor is scarce (especially at present), involves a very large investment of human capital and cannot be replaced by monetary damages or other employment; (2) defendants have wrongfully deprived plaintiff of promotion and tenure, but also of the opportunity to apply effectively for jobs at other law schools.

(Id. at 37, 38 (citing Cohen v. County of Cook, Ill., 677 F.Supp. 547, 551 (N.D.Ill.1988)); Assaf v. Univ. of Texas Sys., 399 F.Supp. 1245 (S.D.Tex.1975); Schrank v. Bliss, 412 F.Supp. 28, 40 (M.D.Fla.1976)). In asserting this argument, plaintiff contends that Magistrate Judge Heckman "ignored ... the precedents of Cohen and Schrank." (Id. at 39). Plaintiff also asserts that Magistrate Judge Heckman improperly discounted Assaf's importance in connection with his destruction of career argument. Plaintiff also asserts that the Magistrate Judge's reliance on Faro v. New York Univ., 502 F.2d 1229, 1232 (2d Cir.1974) is misplaced, as the facts of that case are inapposite to the arguments of plaintiff.

■ It appears clear to this Court that Magistrate Judge Heckman was not bound by the decisions in Schrank v. Bliss, 412 F.Supp. 28, 40 (M.D.Fla.1976) and Cohen v. County of Cook, Ill., 677 F.Supp. 547, 551 (N.D.Ill.1988), and thus was not required to apply the holdings of those cases to this case.

Moreover, this Court fails to discern how the Cohen and Schrank cases support plaintiff's "destruction of career" argument. In Schrank, the court found that plaintiff, a deputy sheriff, was "summarily discharged from his job over an extraneous matter" which the defendant sheriff should never have been involved. Moreover, irreparable injury was found because of the extraordinary circumstances of the case which included the facts that plaintiff and his wife, who was disabled, not only would lose desperately needed medical benefits, but also would be evicted from their county owned house. Moreover, defendant had an obligation under the law to notify future employers of the reason for plaintiff's termination and defendant had publicly disseminated through the press the charge against plaintiff, which the court found to be of "highly dubious validity." But most important in the decision was the fact that the defendant may have been immune under the Eleventh Amendment and thus plaintiff may not have been able to recover back wages. This Court finds that the circumstances of the case at hand do not rise to the level of "extraordinary" as in Schrank. Thus, this case can not be distinguished from Sampson, supra, which holds generally that preliminary injunctions are improper in employment-termination cases absent distinguishing circumstances of extraordinary cases.

Similarly, inapposite is the Cohen case, wherein a physician brought a civil rights action alleging that defendants refused to process his application to become an attending physician and were eliminating his position based on his exercising of his free speech rights. The court found that even if plaintiff prevailed on the merits it was likely that the court would be unable to award plaintiff even an opportunity to fill the position that was being eliminated. Further, the court clearly based a finding of irreparable injury on the violation of plaintiff's First Amendment rights. As earlier discussed herein, plaintiff has failed to demonstrate such a violation.

As to plaintiff's reliance on Assaf v. Univ. of Texas Sys., 399 F.Supp. 1245 (S.D.Tex. 1975), it should be noted that the decision

was vacated as moot by the United States Supreme Court. Thus, this Court agrees with Magistrate Judge Heckman's determination that very little, if any, weight should be given to the decision. Moreover, plaintiff's reliance on *Assaf* is misplaced as *Assaf* is factually distinguishable from plaintiff's case. In *Assaf,* the nontenured plaintiff's contract with the University of Texas System specifically provided that his "appointment was subject to the provisions of the *Rules and Regulations* of the Board of Regents ...," which required the university to give notice by a certain date to nontenured faculty members if they were not to be reappointed. *Id.,* 399 F.Supp. at 1247. The court held that a property interest was created because on the date that plaintiff was to receive notice from the university and no notice was received, he had a justified expectation that he would be rehired. The court found it of great importance that the parties were bound contractually to follow the *Rules and Regulations* of the university. In the case at hand, this Court has not been made aware of any contractual obligation which bound the Law School to follow its own rules.

As to irreparable harm, the *Assaf* court found the circumstances of the case to fall within the limited category of being a "genuinely extraordinary situation." The court specifically found that there was greater injury than the mere threat of loss of

> income which the *Sampson* court admonishes to be insufficient to alone constitute irreparable injury. (citation omitted). Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician, especially one in the sciences. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allow plaintiff to mingle as a equal in the academic milieu, can only be poorly replaced by money.

*Id.,* 399 F.Supp. at 1245. It is important to note that all of the "losses" in *Assaf* could have been prevented by the issuance of the preliminary injunction. Here, plaintiff already has been terminated, thus it is not the status quo that is being preserved as in *Assaf.* Moreover, plaintiff is not deprived of the ability to research as several law libraries are available throughout the city. The research of a lawyer certainly is not limited to a laboratory as is the research of a scientist. Thus, it is clear that even if this Court were to afford considerable weight to the reasoning of *Assaf,* plaintiff's case is clearly distinguishable and does not fall within the "genuinely extraordinary situation."

Further, this Court agrees that the Magistrate Judge properly relied on *Faro v. New York Univ.,* 502 F.2d 1229 (2d Cir.1974) for the proposition that the failure to obtain employment as a professor is no different "from hundreds of others who find that they have to make adjustments in life when the opening desired by them does not open." (Report and Recommendation at 30 (quoting *Faro,* 502 F.2d at 1232)). Although the underlying cause of action in *Faro* was based on alleged employment discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* its holding is directly on point with plaintiff's argument that somehow seeking a position as a professor at a university should be distinguished from the all other persons seeking employment because of the uniqueness of such position. *Faro* clearly contradicts such a theory. Plaintiff in *Faro* was a research professor at New York University engaged in primate studies. *Id.,* 502 F.2d at 1230. Plaintiff was compensated from special funds. When the funds were no longer available, plaintiff was offered a position at her current salary but without tenure possibilities. Plaintiff refused the offer and sought to enjoin New York University from changing her employment status. The Second Circuit determined that the plaintiff had failed to demonstrate irreparable harm by showing that she did not get the position she sought. *Id.,* 502 F.2d at 1232. She was just another disappointed applicant.

Finally, plaintiff argues that Magistrate Judge Heckman did not consider the affidavits of Professors Richards and Nelson. (pl. obj. at 31). In short, these affidavits state that if the preliminary injunction is not

granted plaintiff's chances of continuing his career as a professor will be greatly diminished. Although Magistrate Judge Heckman did not discuss the affidavits specifically, it is clear to this Court that these affidavits do not support plaintiff's "destruction of career" theory. Moreover, such a theory can not provide a basis for plaintiff's claim of irreparable injury.

Therefore, having now completed discussion of plaintiff's three arguments as to irreparable injury and having determined that one of them does demonstrate irreparable injury since defendants may be immune from monetary damages based on the invocation of Eleventh Amendment immunity or the doctrine of common law qualified immunity, this Court now proceeds to a consideration of the second necessary prong for obtaining a preliminary injunction, plaintiff's likelihood of success on the merits of his First Amendment claim and his due process claim.

### 2) *Likelihood of Success on the Merits—First Amendment Claim*

■ To succeed on his motion for preliminary injunction as to his First Amendment claim, plaintiff must demonstrate (1) that he engaged in "speech" that is protected by the First Amendment; (2) that he was the target of an adverse employment decision [11] and; (3) that his protected conduct was a "substantial factor" or a "motivating factor" in the adverse employment decision. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 577, 50 L.Ed.2d 471 (1977); *see also Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708

(1983). Plaintiff bears the burden of establishing all three prongs.[12] However, plaintiff herein fails to meet his burden of persuasion as to any one of the three prongs and thus, his motion for a preliminary injunction on his First Amendment claim must be denied, as more fully discussed below.

#### a) *Protected Speech*

■ In order to sustain an action under 42 U.S.C. § 1983 for infringement of freedom of speech, plaintiff first must show that the speech was protected.[13] The first inquiry "is one of law, not fact," *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7, and "[t]he burden rests with the plaintiff to show that his speech was constitutionally protected." *Nieto v. San Perlita Indep. Sch. Dist.*, 894 F.2d 174, 179 (5th Cir.1990).

■ Initially, this Court must decide whether the speech at issue touches on a matter of public concern. In so determining, this Court must look to whether the speech can be fairly considered as relating to any matter of political, social, or other concern to the community. *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *see also Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. This examination requires an analysis of the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. Moreover, it is not enough that the topic of the speech be of general interest to the public. What is actually said must meet the public concern threshold. *Schalk v. Gallemore*, 906 F.2d 491, 494–95 (10th Cir.1990) (citations omitted). *See also,*

---

**11.** The test outlined herein was originally articulated in *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 577, 50 L.Ed.2d 471 (1977), and is commonly referred to as the "Mt. Healthy test." In *Mt. Healthy*, it was undisputed that plaintiff had been the target of an adverse employment decision and thus prongs two and three, were combined into one inquiry. However, in Professor Blum's case herein the question of whether defendants reached an adverse employment decision or whether plaintiff withdrew from consideration for promotion and tenure is hotly disputed, thus, this Court divided the inquiry into separate questions to be discussed individually.

**12.** If plaintiff were to establish the three prongs articulated, the burden then would shift to the defendants to show that the same adverse employment decision would have been reached even in the absence of any protected conduct. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. However, because plaintiff herein has failed to meet his burden of establishing the first three prongs of the *Mt. Healthy* test, this Court need not engage in a discussion of the defendants' burden.

**13.** On the whole, the concept of free speech commonly is associated with the "expression of differing viewpoints or alternative ideas." *Abramson et. al v. Gonzalez, et al.*, 949 F.2d 1567 (11th Cir.1992).

*Terrell v. Univ. of Texas Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987) ("[T]he mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment"). This Court is required "to look at the *point* of the speech in question: was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?" *Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir.1985).

In the present case, plaintiff concludes that his speech is protected because of his claims that he made statements concerning the war on drugs and other "controversial subjects." Plaintiff also implies that certain letters written to faculty members relating to his promotion and tenure and suggesting changes in school policies and curriculum fall within the realm of protected speech. Although plaintiff seemingly groups his "speech" on the drug war and other "controversial subjects" with the letters written to faculty members, it is clear to this Court that the two groups should be discussed separately as the potential protection afforded each is different, as discussed herein.

▮▮▮ Plaintiff asserts generally that he spoke on the "drug war" and other controversial issues but fails to specifically describe, with citations to the record, any instance of speech he contends is protected. Mere generalizations are insufficient to sustain plaintiff's burden of establishing that his speech related to a matter of public concern. However, this Court took it upon itself to search the entire record for competent specific evidence that plaintiff engaged in protected speech. The only "evidence" contained in the record approximating a matter of public concern are two articles published in the student magazine wherein plaintiff voiced his views on the penalties of marijuana possession and an article discussing a debate in which plaintiff was involved relating to civil disobedience. Although on the surface a discussion of illegal drugs and a debate on civil disobedience may appear to be of public importance, this Court must be mindful of the Supreme Court's caution in *Connick* that "[t]o presume that all matters which transpire within a [state institution] are of public concern would mean that virtually every remark ... would plant the seed of a constitutional case." *Connick,* 461 U.S. at 149, 103 S.Ct. at 1691. Without specific evidence that these articles or debate touched a matter of public concern, this Court must find that plaintiff failed to meet his burden of establishing that such speech was "protected."

▮▮▮ Moreover, even if they were to be considered a matter of public concern, this Court must "look beyond that fact to the employee's motive for raising them." *Linhart,* 771 F.2d at 1010. Given plaintiff's admitted personal interest in the legalization of marijuana, it appears likely that plaintiff simply was airing his own feelings about drugs and that his motivation for writing the articles was personal. To the extent that his articles or the debate raised larger public concerns, any such purpose very likely was secondary to his personal interest. *Wadud v. Willsie,* 735 F.Supp. 1488, 1495 (D.Kan. 1989). Since plaintiff has presented absolutely no evidence to the contrary, this Court finds that it is as likely as not that plaintiff's motivation was personal and thus, he has failed to meet his burden of persuasion as to the matter of public concern.

▮▮▮ This Court also notes that plaintiff presents no evidence that the speech at issue in this case was made primarily in his role as citizen and not in his role as employee as is required by *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. In fact, the form of the "speech," that is, articles published in the university magazine and a campus debate, implies that they involve his role as a university faculty member. It is important to have been able to show that plaintiff's speech was in his role as a citizen because the determination as to whether "speech" is protected involves " 'a balance between the interest of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct.

2891, 2896–97, 97 L.Ed.2d 315 (1987) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968)). Based on the foregoing, this Court finds that plaintiff has failed to establish that the articles or the debate are protected speech.

██ As to the letters written to members of the law school faculty relating to plaintiff's promotion and tenure pursuit and suggestions relating to school policies and curriculum, the question of whether they fall within the realm of protected speech is clearer than the articles and debate. The letters unquestionably do not fall within the protection of the First Amendment. (pl. supp. aff. ex. K, "Table of Contents"). Upon thorough examination of all letters in the record as a whole, this Court finds that they do not relate in any way to any political, social or other matter of community concern. Moreover, many of these letters make clear that plaintiff was writing merely as a disgruntled employee complaining of a personal employment dispute. *See Wulf v. City of Wichita*, 883 F.2d 842, 857 (10th Cir.1989). Still others appear to be in the context of general collegial interchange. The First Amendment does not "protect a public employee's right to speak internally about matters of purely personal interest." *Gearhart v. Thorne*, 768 F.2d 1072 (9th Cir.1985) (citing *Connick v. Myers*, 461 U.S. 138, 144–45, 103 S.Ct. 1684, 1688–89, 75 L.Ed.2d 708 (1983)). Based on the foregoing, this Court finds that plaintiff has failed to establish that his letters are protected speech.

Thus, plaintiff's motion for preliminary injunction on his First Amendment claim could be denied on this failure to establish the first prong of *Mt. Healthy* alone. Nevertheless, this Court will proceed with an analysis of the remaining two prongs of the *Mt. Healthy* test because of the importance of plaintiff's application at hand.

b) *Adverse Employment Decision*

██ As mentioned above, plaintiff's primary objection to Magistrate Judge Heckman's Report and Recommendation as it relates to his First Amendment claim concerns her determination that plaintiff consented to postpone his promotion and tenure review and then subsequently withdrew from consideration.

This Court has examined the record carefully and fully agrees with Magistrate Judge Heckman's determination and, for the reasons articulated below, finds that plaintiff was not subjected to an adverse employment decision for purposes of the second prong of the *Mt. Healthy* analysis.

Plaintiff argues that he never consented to review in his seventh year and thus, could not have withdrawn when he submitted his "Personal Resolution." However, the record before this Court is to the contrary. It clearly demonstrates that plaintiff consented to postpone his promotion and tenure review and subsequently withdrew. Whether he subjectively intended to postpone his review is a question that cannot be answered definitively by this Court, although it can be said that plaintiff through his correspondence with Law School faculty, certainly gave the impression that he was consenting to the postponement.

In October of 1990, plaintiff demanded that his promotion and tenure review be scheduled for March 15, 1991. The Dean of the Law School acknowledged plaintiff's request, but suggested that plaintiff consider deferring review until the fall of 1991. Accompanying this suggestion were ways set forth in which plaintiff could procure time during the Spring of 1991 to work on his "scholarship" and thereby, increase his chance for promotion and tenure. The Dean stated that should plaintiff defer, his contract would be extended to cover the academic year 1991–1992. Plaintiff responded that the suggestion to defer review and extend his contract indicated a cooperative solution and "may be a step in the right direction." [14] Plaintiff

---

**14.** Although plaintiff continually argues that he initially conditioned acceptance of the deferral option on being provided with an "identical contract," the record reflects that plaintiff initially conditioned acceptance on receipt of the "proper appointment papers." Plaintiff later requested an identical contract, but did not do so initially. This contention by plaintiff is irrelevant to the determination of plaintiff's consent to deferral of promotion and tenure review because, assuming

subsequently informed the Dean that he was relying on the deferral option because he had failed to make the progress on his scholarship that he had hoped to make. The Dean followed up with a letter expressing his belief that plaintiff had made "an appropriate choice in deciding to defer ... tenure consideration until" the fall of 1991. Upon its receipt, plaintiff sent a response letter that very day and in no way indicated that he had not decided to defer promotion and tenure review. Instead, plaintiff again requested confirmation that his contract would be extended to the academic year 1991–1992. The Dean then undertook to obtain the necessary confirmation of plaintiff's extended appointment. This, as well as prior and subsequent correspondence from the Dean, indicates that the Dean understood plaintiff to be deferring review. In fact, this Court is of the opinion that any reasonable person would have understood plaintiff to be deferring tenure review.

Dean Filvaroff sent a letter to plaintiff, dated December 21, 1991, stating that plaintiff's promotion and tenure review would take place in the fall of 1991. Apparently, plaintiff did not receive this letter until sometime in mid to late January. This is of no consequence, however, because upon its receipt, plaintiff merely disputed what offer was extended to him and did not object to the statement that he was to be reviewed in the fall of 1991. In other words, plaintiff was of the opinion that Dean Filvaroff had breached an oral promise to him that he would be given "technical tenure" without any review from the faculty. Plaintiff argues that his response to the December 21st letter must have made defendants aware that he had not consented to postpone review. However, the language of the letter belies this assertion because it discussed the completion of his Visiting Committee with the addition of Law School Professor Kenneth Joyce. In fact, it thus indicates that he understood that his promotion and tenure review was to take place sometime in the future. Therefore,

even though plaintiff was disputing what offer had been extended to him, he continued to discuss his ultimate promotion and tenure review. Other letters alluded to his contract dispute, but none ever indicated that plaintiff had not agreed to postpone his promotion and tenure review.

Later, in May of 1991, plaintiff attacked the review process but gave no indication that he had not consented to a postponement of his promotion and tenure review, notwithstanding the fact that he had unambiguously been informed by Dean Filvaroff at least twice that the Promotion and Tenure Committee believed he had deferred. It was not until August of 1991, when the possibility of promotion and tenure review in the academic year 1990–1991 was an impossibility, did plaintiff state that he never consented to tenure review in the fall 1991.

Plaintiff, in attempting to substantiate his argument that he never consented to a seventh year review, maintains that the issue was already decided when this Court allowed discovery to go forward following the filing by plaintiff of an amended complaint. He argues that had he consented to a seventh year review, the filing of his original complaint in his seventh year would have been premature and thus dismissed based on ripeness grounds. By allowing discovery to go forward, plaintiff contends that this Court determined that the case was ripe for litigation and in so determining also determined that he never consented to a seventh year review.

This is a creative but meritless argument. Plaintiff seeks to place the burden of determining the merits of a case wholly on this Court *prior* to allowing any of the parties to engage in any discovery. Such a burden is neither appropriate nor practical. This Court would not engage in a *sua sponte* determination of ripeness and then merely allude to such decision by allowing discovery to go forward.[15]

arguendo that plaintiff did request an identical contract, the defendants' failure to provide him with such a contract is, at best, a cause of action for breach of an oral promise and does not

diminish the effect of his apparent consent to defer promotion and tenure review.

15. Plaintiff also states that by allowing discovery to go forward, this Court "caused him to expend

Based on the record now before it, this Court finds that any reasonable person under the circumstances, as articulated above, would have concluded that plaintiff had deferred his promotion and tenure review until the fall of 1991. Plaintiff's assertion that he did not so consent is, at best, no more than an unexpressed, subjective belief that he had not so consented.

Having found that plaintiff deferred promotion and tenure review until his seventh year, this Court must determine whether or not plaintiff withdrew from consideration so that he could not have been the subject of an adverse employment decision. Based on the document plaintiff entitled "Personal Resolution," this Court finds that plaintiff did withdraw from consideration. Plaintiff "declare[d]—clearly, unambiguously and without conditions—that [he did] not want a Promotion and Tenure Evaluation." A withdrawal from consideration could not have been any clearer.

As Magistrate Judge Heckman correctly determined, "plaintiff's failure or refusal to submit to formal tenure review is ... fatal to his retaliatory discharge claim." (Report and Recommendation at 38 (citing *Savage v. Gorski,* 850 F.2d 64, 68 (2d Cir.1988))); *Simmons v. Lyons,* 746 F.2d 265, 268 (5th Cir. 1984)). Plaintiff attempts to distinguish the cases cited by Magistrate Judge Heckman by arguing that, unlike the defendants in *Savage* and *Simmons,* defendants here knew that plaintiff wanted to be considered for promotion and tenure. While it is true that until the time plaintiff submitted his "Personal Resolution," defendants knew that plaintiff wanted to be considered for promotion and tenure, as discussed *supra,* the record shows that they were anticipating reviewing plaintiff in the academic year 1991–1992. Before such review could be completed, plaintiff withdrew from consideration.

Moreover, plaintiff acknowledges that a seventh year review was ongoing but attempts to discount such review by asserting that it was nothing more than a means of facilitating settlement once plaintiff had initiated the lawsuit and that the review was a sham, intended as a litigation maneuver. These assertions are wholly unsubstantiated by the record. There is absolutely no indication in the record that defendants, or the university, were interested in reaching a settlement in this case or that the ongoing review was a "sham" or a litigation maneuver. Such assertions are merely plaintiff's subjective interpretation, are not evidence and thus are no support for his argument. As articulated by Magistrate Judge Heckman, plaintiff failed to comply with the requirements for job retention and was "terminated" by "operation of contract, and not as a result of any 'denial' traceable to conduct on the part of defendants." (Report and Recommendation at 38).

Based on the foregoing, this Court finds that plaintiff has failed to establish the second prong of *Mt. Healthy* in that he has not met his burden of demonstrating that he was the target of an adverse employment decision.

### c) *Motivating Factor*

■ As to the third and final prong of the *Mt. Healthy* test, plaintiff has not come forward with any evidence that his published articles or his debate participation motivated defendants to deny him tenure.

Plaintiff baldly asserts that he was denied promotion and tenure because of his "outspokenness" and claims that he was treated differently than other promotion and tenure candidates. However, these assertions are not supported by the record. As discussed above, plaintiff asserts that he was outspoken, but fails to give specifics relating to any "outspokenness." Further, plaintiff fails to include any indication of how other promotion and tenure candidates were treated or how his treatment varied from the norm. His bald conclusions carry absolutely no evidentiary weight, and thus, this cannot serve as a basis for the issuing of a preliminary injunction.

limited resource." Each plaintiff to every lawsuit makes a conscious determination to go forward with his or her lawsuit. The courts do not "cause" litigants to initiate or proceed with their case. Each determination by a litigant is individual and without influence from the courts. Plaintiff's decision to expend "limited resources" was a choice he and he alone made.

On the other hand, the record indicates that the defendants were concerned with plaintiff's performance as an associate law professor. This concern hindered plaintiff's suitability for promotion and tenure, thus prompting the suggestion that plaintiff defer review. (*See e.g.* def. supp. aff. ex. B, C, A–21, A–69). Whether this concern by defendants was real, imagined or fabricated is irrelevant to this motion because it is plaintiff who bears the burden of establishing motive. In the absence of any specific facts supporting a retaliatory motive, this Court concludes that plaintiff has failed to sustain his burden of establishing retaliatory motive as required under prong three of *Mt. Healthy.*

Thus, because plaintiff has failed to meet his burden of establishing all three prongs of the *Mt. Healthy* test, his motion for preliminary injunction on his First Amendment claim is denied.[16]

### 3) *Likelihood of Success on the Merits— Due Process Claim*

#### a) *"Untimeliness" Claim*

The parties do not dispute that under ordinary circumstances promotion and tenure review is to take place in the candidate's sixth year of teaching. However, the candidate may request that such review take place in his seventh year. Plaintiff has continually stated that he did not consent to a seventh year review and much of his due process argument centers on his objection to the Magistrate Judge's finding that he did consent to a seventh year review. As discussed in detail, *supra,* this Court finds that plaintiff did so consent and thus, will not revisit that issue as it relates to his due process argument.

■ Clearly, plaintiff's due process claim should fail because plaintiff was given all the process that was due. However, given the significant attention devoted by the parties to the related question of a "protected liberty or property interest," this Court will engage in an analysis of such interest.

Plaintiff acknowledges that Magistrate Judge Heckman correctly identifies the key legal issues surrounding plaintiff's due process claim. (Id. at 24, 25). However, he argues that he had a "property interest in demanding a timely promotion and tenure review during his sixth year...." (Id.). Plaintiff disagrees with the conclusion in the Report and Recommendation that even if plaintiff were denied tenure review in his sixth year, that "conduct does not constitute actual or threatened injury to a constitutionally protected due process ... interest actionable under § 1983." (Id.). Plaintiff asserts that the Magistrate Judge misread *Dube v. State Univ. of New York,* 900 F.2d 587 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991), upon which she relies for the aforestated conclusion. He argues that *Dube* does not stand for the proposition that due process rights do not attach to tenure review, but rather requires each case to be looked at factually and decided accordingly. (Id. at 27). The failure of some tenure candidates to demonstrate property interests does not support the broad notion that administrative regulations governing the tenure process can never constitute property interests. Plaintiff contends that Magistrate Judge Heckman did not consider the facts of his case, but rather applied the facts of the *Dube* case to reach the conclusion that plaintiff had no "legitimate claim of entitlement." (pl. obj. at 26).

"Property interests may be created by either statutory entitlements or administrative regulations." (Id.). Plaintiff argues that administrative rules should be given constitutional protection and supports this contention by asserting that "[p]roperty interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." (Id. at 28 (citing *Bd. of Regents of State Colleges v.*

---

**16.** This Court notes that plaintiff maintains that he is not required to exhaust his administrative remedies. However, Magistrate Judge Heckman's Report and Recommendation does not state, nor does it imply, that plaintiff was re-quired to exhaust his administrative remedies. (pl. obj. at 13–14) Therefore, this Court will not discuss "objections" to issues not raised in the Report and Recommendation.

*Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972))).

Plaintiff agrees with the statement that the existence of a property interest in tenure procedures depends on the establishment of a legitimate claim of entitlement, however, that entitlement need not be an entitlement to promotion and tenure it may be an entitlement to have the institution follow its rules that "constrain the discretion of the decision makers in ways that benefit the candidate." (Id. at 28). The rule that promotion and tenure reviews must be in the candidate's sixth and second-to-last year on the faculty is precisely such a rule, according to plaintiff. (Id.). Plaintiff argues that his case is factually distinguishable from *Dube* because, unlike professor Dube, plaintiff claims violations of a specific rule that limited decisionmakers' discretion, that is, the rule that requires candidates to be reviewed in the sixth year. (Id. at 29). Plaintiff cites a Third Circuit case, which held that rules of a faculty handbook that require a certain type of hearing to be held before termination of employment, must be followed prior to termination, in support of his argument. (Id. at 30 (citing *Skehan v. Bd. of Trustees of Bloomsburg State College,* 590 F.2d 470, 485 (3d Cir.1978))). Further, plaintiff argues that the harm in having review later than the sixth year is that in so doing "most faculty would effectively give up the review all together or face immediate unemployment with no prospects of teaching jobs elsewhere." (Id. at 31). Moreover, such delay would "severely impair the faculty members [sic] capacity to retain intellectual independence. This in turn would encourage the growth of cult-like organizations taking over academic departments...." (Id.). As to this argument, plaintiff maintains that had Magistrate Judge Heckman considered the affidavits of Professors David A.J. Richards and William Nelson, which explain the importance of a sixth year review and the destructive effect of deprivation of such review on plaintiff's career as a law professor and also the American Association of University Professor's basic document *Academic Freedom and Tenure: 1940 Statement of Principles and Interpretive Comments* (as revised in 1970), specifically Comment # 7, (see plaintiff's Reply

Affidavit attachment), she would have understood fully the importance of a sixth year review. (Id. at 32).

Defendants respond that Magistrate Judge Heckman properly applied the holding of *Dube* to this case, which facts are similar. (Id. at 10–11). Moreover, they correctly point out that following the cases which disagree from other circuits, as cited by plaintiff, would require this Court to ignore Second Circuit authority.

This Court does not disagree that it may be important for a review to be conducted in the sixth year of teaching, however, this Court "must look not to the 'weight' but to the *nature* of the interest at stake." *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972) (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972) (emphasis in original)). It "must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property." *Id.* The type of interest plaintiff asserts was discussed extensively in *Dube.* The Second Circuit clearly stated that no property interest attaches to a professor's expectation that a university will follow its internal procedures for tenure review. This Court agrees with Magistrate Judge Heckman that *Dube* is directly on point with the case at hand.

Professor Dube claimed a "lack of procedural due process in the promotion and tenure review procedure...." *Dube,* 900 F.2d 587, 599. The Court stated that a "claim to tenure constitutes a protected property interest only if it amounts to a 'legitimate claim of entitlement' thereto." *Id.* (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). Because Dube had established only that he was entitled to tenure in accordance with established contractual procedures, he failed "to meet the threshold requirement of establishing a protected 'liberty' or 'property' interest." *Id.* (citing *Clemente v. United States,* 766 F.2d 1358, 1364–65 (9th Cir.1985)) (procedural requirements, which provided no significant restrictions on decision-maker or articulable standards to guide his discretion, held not to establish Fourteenth Amendment property

interest), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 881, 88 L.Ed.2d 917 (1986); *Siu v. Johnson*, 748 F.2d 238, 243 n. 11 (4th Cir. 1984) (established procedures relating to tenure review held not to constitute Fourteenth Amendment property interest); *Shango v. Jurich*, 681 F.2d 1091, 1101 (7th Cir.1982) (state created procedural right held not to constitute Fourteenth Amendment liberty interest); *Bills v. Henderson*, 631 F.2d 1287, 1298–99 (6th Cir.1980) (procedural rules created by state administrative bodies held not to establish protected Fourteenth Amendment liberty interest); *Jones v. Kneller*, 482 F.Supp. 204, 210 (E.D.N.Y.1979) (contractual right of tenure review and confrontation held not to give rise to Fourteenth Amendment property interest), *aff'd mem.*, 633 F.2d 204 (2d Cir.), *cert. denied*, 449 U.S. 920, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980)). Thus, the Court, apparently rejecting the rational in *Skehan v. Board of Trustees*, 590 F.2d 470, 485 (3d Cir.1978), upon which plaintiff relies, dismissed Dube's Fourteenth Amendment claim.

■ The record in this case fails to reveal any extraordinary circumstances which would distinguish plaintiff's case from the majority of cases, including *Dube*, which stand for the general proposition that no property interest attaches to a person's expectation that he be considered for tenure in accordance with established procedures because there is no "legitimate claim of entitlement thereto."[17] *Id.*, 900 F.2d at 599.

Plaintiff attempts to distinguish his case from those cited by the Second Circuit by stating that he cites a violation of a specific rule. The cited cases do not distinguish instances where a "specific rule" was violated from instances where there was no allegation of such a violation. Moreover, plaintiff seeks to have this Court not only disregard what appears to be a strong trend among the circuits in finding no property interest in the procedures of tenure review, but also the clear authority of the Second Circuit, which also so finds, in favor of one case which

appears to be in the minority, *Skehan v. Board of Trustees*, 590 F.2d 470. This Court will not do so.

Accordingly, this Court finds that, for purposes of this motion for preliminary injunction, plaintiff has failed to establish a legitimate property interest in the right to require the university to follow its tenure procedures. Thus, this Court agrees with Magistrate Judge Heckman's determination that, "[e]ven assuming, *arguendo*, that the SUNY rules required tenure review no later than the sixth year of teaching, plaintiff's due process claim lacks merit." (Report and Recommendation at 36).

### b) *"Arbitrariness" Claim*

■ Plaintiff also asserts a due process "arbitrariness" claim, which he alleges that Magistrate Judge Heckman failed to address. Plaintiff's theory is that there is a protected interest in having "basic merit based criteria applied." (pl. obj. at 24, 25). Plaintiff argues that he has both a property and liberty interest in "demanding compliance with the university's commitment ... that promotion and tenure decision ... be made on the basis of performance as a scholar and teacher, supplemented by assessments of university or community service." (Id. at 32). Plaintiff argues that these "guarantees impose identifiable limits on the discretion of decision makers." (Id.). The liberty interest is in seeking to pursue his chosen career of university professor and this "interest is rooted in the constitution itself." (Id. at 33 (citing *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972))). Plaintiff acknowledges that the liberty interest he speaks of is not necessarily infringed by the loss of a particular job, but rather it is "infringed when the job is lost in a manner that imposes a stigma on the employee that makes it more difficult to obtain other jobs in the same profession." (Id. (citing *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)); *Zimmerer v. Spencer*, 485 F.2d 176, 179 (5th Cir.1973)). Plaintiff asserts that the denial of promotion and ten-

---

**17.** By reaching this determination, this Court is by no means advocating that a blanket rule that a "legitimate claim of entitlement" never attaches to the expectation that a government body follow its own rules be applied blindly and without an examination of the facts of each particular case. This determination merely applies the holding of *Dube*, which is factually similar to this case.

ure is precisely the type of termination that invokes such infringements because other law schools assume that their counterparts have followed their own rules and any denial of promotion and tenure is a result of the candidate's deficiencies. (Id.). Plaintiff further asserts that the record as a whole indicates that there has been a "stark departure from the exercise of professional judgment." (Id. at 34).

Plaintiff's "arbitrariness argument" has an insurmountable flaw. Plaintiff was never reviewed by the Law School's Promotion and Tenure Committee. Plaintiff's assertion that Dean Filvaroff denied him tenure in October of 1990 when he informed plaintiff that his chance of receiving promotion and tenure in the near future was unlikely because of "weak scholarship" is insufficient to overcome this flaw. Notwithstanding plaintiff's assertion to the contrary, the statement was not a denial of promotion and tenure. The record reflects that at the time, plaintiff did not consider this statement a denial as he demanded promotion and tenure review to be held the following March. Moreover, there is no evidence in the record of any "arbitrariness." Plaintiff's bald assertion that he was a better professor with stronger "scholarship" than other candidates that were awarded tenure is completely unsupported.[18]

Finally, this Court notes that the cases cited by plaintiff in support of his "arbitrariness argument" in no way support his theory. *Roth* actually weighs against plaintiff's argument. In that case, an untenured faculty member sued when he was not rehired after his first year of teaching. The United States Supreme Court determined that the state had made no charge against plaintiff that would seriously damage his standing and associations in his community and thus he had failed to establish that he had been deprived of "liberty" protected by the Fourteenth

Amendment. Plaintiff's assertion that he has been damaged because he will be unable to obtain another teaching job as a result of defendants' conduct is not the type of damage contemplated by the Fourteenth Amendment.[19] If any damage has been done to plaintiff's reputation it is by his publication, which of course he was free to do, of the Law School's comments to him relating to his ability as a professor.

The *Paul* Court held that Paul's right to due process was not violated by the City Police Department when they placed his name on a list of "active shoplifters" and distributed the list. This Court fails to detect any correlation between plaintiff's "arbitrariness" claim and the *Paul* case.

Based on all of the foregoing, this Court determines that plaintiff has failed to meet his burden of demonstrating likely success on the merits of his due process claim of arbitrariness.

*4) Sufficiently Serious Question/Balance of Hardships*

The final consideration to be addressed in connection with plaintiff's seeking of a preliminary injunction is the alternate prong two determination of serious questions going to the merits and balance of hardships. In this regard, plaintiff objects generally to Magistrate Judge Heckman's finding that the balance of hardships tips in favor of the defendants rather than the plaintiff. (Id. at 40). Among other things, plaintiff asserts that he is now unemployed, experiencing financial hardship and probable destruction of his career, but defendants cannot be harmed in any way by allowing him to continue to teach. (Id.). Plaintiff argues that if the publicity generated by him and surrounding this case has proven to be a hardship on defendants, that hardship can be alleviated by allowing him to teach. (Id. at 41). Finally, plaintiff

---

**18.** This Court notes that plaintiff has submitted what he calls a summary of tenure candidates and their scholarship. These candidates are merely listed as candidate "A," "B" etc. Moreover, plaintiff does not include the documents relied on in compiling the summary nor does he indicate the source of the information used in compiling the summary. Thus, such document has no evidentiary value and cannot be relied upon to support plaintiff's arguments.

**19.** The type of "damage" which would implicate Fourteenth Amendment rights and thus require a hearing prior to taking action thereon would be "a charge, for example, that [the person] had been guilty of dishonesty, or immorality." *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707.

argues that his loss of employment, "may well not constitute irreparable harm," but nonetheless is a hardship. (Id.).

 As articulated in this Court's discussion, *supra*, on the likelihood of success on the merits, plaintiff falls considerably short of showing that he is likely to succeed. This shortfall is to such a degree that this Court is of the opinion that plaintiff's claims do not meet the more lenient standard of raising "sufficiently serious questions going to the merits to make them fair ground for litigation." *See Caulfield v. Bd. of Educ. of City of New York*, 583 F.2d 605, 610 (2d Cir.1978).

Moreover, this Court agrees with Magistrate Judge Heckman's determination that the balance of hardships does not tip decidedly in plaintiff's favor because, although plaintiff is now unemployed which in and of itself may be considered a hardship, the hardship inflicted on defendants, should this Court require them to allow plaintiff to resume teaching, vastly outweighs plaintiff's hardship of unemployment. The hostility between plaintiff and defendants that has been provoked by this litigation is apparent. This Court agrees with Magistrate Judge Heckman's determination that returning plaintiff to the Law School at this time "would cause significant harm to the educational mission of the university so as to tip the balance of hardships in defendants' favor." (Report and Recommendation at 40).

Accordingly, this Court finds that plaintiff has failed to demonstrate "sufficiently serious questions going to the merits to make them fair ground for litigation *and* a balance of hardships tipping decidedly ..." in his favor. *Caulfield*, 583 F.2d at 610.

### CONCLUSION

Based on the foregoing, this Court, pursuant to 28 U.S.C. § 636(b)(1)(C), accepts the Report and Recommendation of Magistrate Judge Heckman except as modified herein to deny plaintiff's application for preliminary injunction and finds that plaintiff has failed to meet his burden of establishing the requirements for issuance of a preliminary injunction pursuant to Fed.R.Civ.P. 65(a).

### ORDER

IT HEREBY IS ORDERED, that plaintiff's application for preliminary injunction is DENIED.

SO ORDERED.